Jesus Alarcon **RODRIGUEZ**, Appellant,

v.

The **STATE** of Texas, Appellee.

No. 62060.

Court of Criminal Appeals of Texas.

Sept. 15, 1982.

Steven Bercu, El Paso, for appellant.

Steve W. Simmons, Dist. Atty., and William M. Lockhart, Asst. Dist. Atty., El Paso, Robert Huttash, State's Atty., Austin, for the State.

Before ODOM, TOM G. DAVIS and CLINTON, JJ.

## OPINION

CLINTON, Judge.

This case presents a spree of four robberies during a period of some three weeks, by threatening and placing each victim in fear of imminent bodily injury and death, the alleged element of aggravation being using and exhibiting a deadly weapon.[1]  V.T.C.A. Penal Code, §§ 29.02 and 29.03.  Trial on the merits was to a jury, and it found appellant guilty of aggravated robbery as alleged in each of four counts.  Punishment was assessed by the trial court at confinement for periods of five, fourteen, fourteen and twenty-three years (enhanced), respectively; two counts of forgery in another pending cause were considered by the court pursuant to V.T.C.A. Penal Code, § 12.45;[2] and each indeterminate sentence is to run concurrently.

The first robbery was committed December 18, 1977, the last two—simultaneously—January 9, 1978.  Appellant was arrested January 13, 1978; the multicount indictment was returned January 27, 1978; the State filed a written announcement of ready on June 30 and again on July 3, 1978.  There were several pretrial settings, and finally on December 19, 1978 the case was set for trial January 22, 1979.

■ January 11, 1979 appellant filed his motion to set aside the indictment pursuant to Article 32A.02, V.A.C.C.P., a part of the Texas Speedy Trial Act (the Act), and the trial judge set it for rehearing January 17, 1979, and thereupon denied the motion to dismiss.[3]  This ruling is claimed to be error by appellant in his first ground of error, but it is not.  *Barfield v. State,* 586 S.W.2d 538,

---

1. The deadly weapon is alleged to be "a knife that in the manner of its use and intended use was capable of causing death and serious bodily injury," V.T.C.A. Penal Code, § 1.07(a)(11)(B).

2. If we understand it correctly, appellant says in his brief that "punishment for those [two forgery] offenses was assessed at not less than five nor more than twenty three years imprisonment," but we find no more than that the trial court was "taking into consideration . . . the two counts of forgery in Cause No. 31779." According to § 12.45, supra, that is all the court could do, see *Wilkins v. State,* 574 S.W.2d 106 (Tex.Cr.App.1978), and from this record that is all it did do.

3. The "hearing" consists of a colloquy between the trial judge and counsel for the parties.  Every participant seems to have agreeably assumed chronological developments in the case, but disagreed as to the applicable law.  At one point the perceptive trial judge remarked, "If the law means, as how I read it, that the State shall be ready, there is no evidence in this file that the State is not ready and your motion would be denied."  Appellant's position, then and now, is that "the State" is, within the meaning of Article 32A.02, supra, the entire entity of State government, so that the indictment must be set aside and the accused shall be discharged "if the State fails to provide a *trial* within 120 days from the commencement of the criminal action" (emphasis by appellant). The trial judge was right, appellant is wrong.

541–542[4] (Tex.Cr.App.1979). The first ground of error is overruled.

The second ground is to the effect that the trial court erred in overruling a motion for directed verdict because the evidence is insufficient to support a conviction in that it fails to show "use of a deadly weapon as alleged in the indictment." The contention is without merit.

In *Denham v. State,* 574 S.W.2d 129, 131 (Tex.Cr.App.1979) the Court overruled *Danzig v. State,* 546 S.W.2d 299 (Tex.Cr.App. 1977) insofar as it and another opinion mentioned required expert testimony to prove a knife is a deadly weapon. In *Hubbard v. State,* 579 S.W.2d 930 (Tex.Cr.App.1979), among others, this Court began to assay the facts of each case to determine "that manner of the weapon's use and intended use was such as to allow the jury to infer that the weapon was deadly," *id.,* at 931. While it seems that the same knife was not used or exhibited, the testimony of each victim of or witness to the robberies justifies the inference obviously drawn by the jury from the facts before it that each was a deadly weapon.

The December 16, 1977 robbery began at about 1:30 p.m. with appellant pretending to be a legitimate customer of the Slow Pitch Inn; after ordering a beer and going to a restroom, appellant then asked the manager for cigarette change. When the manager turned his back to do that appellant "told me to give him the money and pulled the knife on me." The knife was "one of those kind that you open up; it was big," about four to five inches long and half an inch wide, and appellant "pulled" or "poked" the knife at the victim "a few times," causing him to fear that appellant was going to "[s]tick the knife on me, or cut me up, or something, probably kill me," since it was "big enough to cut me up, mess me up real good."

On January 6, 1978, a husband and wife were operating a little grocery store and meat market, the San Jose Grocery, when about 7:15 p.m. from his meat market the owner heard tinkling of a bell indicating the front door was being opened; he looked to the front and saw a man with a patch over his left eye but opened in such a way as not to impede vision completely. The owner heard his wife holler out as the man, identified as appellant, leapt over a counter in the front of the store "to get my wife." In one hand appellant held a "dagger knife" or "hunting knife" about ten inches long; appellant held the wife "by the side with one hand and the dagger on the other side, like that"[5]—pointing the knife right into her side. Asked about the capacity of the knife to do harm to his wife, the husband exclaimed, "Oh, gosh! It was big enough to kill anybody." The wife testified that she went to wait on appellant, his eye covered by white gauze with a hole in the center; he asked for a package of cigarettes and when she presented it, appellant produced the dagger about ten inches long and jumped over the counter. He took hold of her neck and "he put the dagger there,[6] and he made me open the cash register," and took money from it. As the husband came forward with a meat cleaver in one hand and a bottle of wine in the other, appellant threatened, "If you get closer, I will kill her." The wife "believed" that the knife could have killed her.

During the early morning hours of January 9, 1978, two young women were walking together through its parking lot to the

---

4. There is an undated docket sheet entry with respect to the speedy trial motion: "Sept, Oct, Nov, Dec case was not tried—no motion or cause for delay by State or by the Defendant. Reason case was not tried is because no court available. State was ready." Jury trial commenced Monday, January 22, 1979.

5. How an assailant uses a weapon, particularly one that is not deadly *per se,* is of utmost importance when an appellate court is reviewing an implied finding of a deadly weapon for sufficiency of the evidence. Testimonial indications such as "like that," "there" and "here" in reference to the body of a victim may be meaningful to an observing factfinder, but they are not very illuminating to a reviewing court. The record should be made to reflect precisely what the witness is indicating.

6. See note 5 above.

Body Shop when a man, again appellant, came out of a parked car and accosted one of them, Rosa, and grabbed at her purse. Rosa struggled to hold on to her purse; the other woman, Carmen, went to help but Rosa cried out a warning that appellant had a knife. Carmen saw "his blade"—it was five or six inches long—and she "went back, or I'm going to get it." Somehow not too clear from her testimony, appellant managed to get her purse from Carmen, and he also slashed with his knife to "slice some of my hair, coat, windbreaker, wool, a thick silk shirt, pullover, my bra"—"clean cut"—through to her skin. Rosa related that appellant ran toward them, yelled "stop," pulled a knife and "stuck here[7] in my right side," with a blade that was five or six inches long. Scared, she tried to take her purse from a pocket, but when it did not easily come out, appellant grabbed to pull it out, and knocked Rosa down. Rosa yelled to warn her and then appellant cut Carmen. Carmen was taken to a hospital for treatment.

■ We conclude the evidence with respect to each incident is sufficient to support the implied finding of the jury that the knife exhibited or used by appellant in each robbery was a deadly weapon in that "in the manner of its use or intended use [it was] capable of causing death or serious bodily injury." There is little doubt about use of the "dagger" or "hunting knife" against the wife in the San Jose Grocery, especially when coupled with the threat to kill uttered by appellant. *Hubbard v. State,* 579 S.W.2d 930, 931 (Tex.Cr.App. 1979). The other knife or knives also meet the definition. Thus, though injuries actually inflicted on Carmen were nothing like the deep stab wound to Floyd in *Limuel v. State,* 568 S.W.2d 309, 312 (Tex.Cr.App. 1978), the slash all the way through every item of clothing she was wearing indicates that the weapon was deadly, and serious bodily injury was avoided only when she "went back" away from the attack. The knife "poked ... a few times" at the manager of the Slow Pitch Inn, concededly,

presents a closer question. However, since the Court no longer requires expert testimony to support a jury finding that a particular weapon is a deadly one, *Denham v. State,* supra, all the testimony of the manager, particularly that the knife appellant exhibited and "poked" at him was "big enough to cut me up. .," warranted an inference by the jury that the knife was deadly. *Dominque v. State,* 598 S.W.2d 285, 286 (Tex.Cr.App.1980); see *Hawkins v. State,* 605 S.W.2d 586, 588 (Tex.Cr.App. 1980); but see *Davidson v. State,* 602 S.W.2d 272, 274 (Tex.Cr.App.1980). The second ground of error is overruled.

Long out of time, appellant submitted his *pro se* supplemental brief, in which he presents two grounds of error not raised by counsel. Each ground is phrased as a question. Without detailing it, we answer each "No."

The judgment is affirmed.