**The STATE of Texas, Appellant,**

**v.**

**Daniel MIRELES, Appellee.**

**No. 13–94–414–CR.**

Court of Appeals of Texas,
Corpus Christi.

July 31, 1995.

Rehearing Overruled Aug. 24, 1995.

Discretionary Review Refused
Nov. 15, 1995.

---

Steven E. Reis, Dist. Atty., Bay City, Josh McCown, Asst. Dist. Atty., Wharton, Paul D. Andrews, San Antonio, Robinson C. Ramsey, Soules & Wallace, San Antonio, for appellant.

Randy M. Clapp, Duckett, Bouligny & Collins, El Campo, Bradley W. Rapp, Duckett, Bouligny, Collins, Clapp & Collins, El Campo, for appellee.

Before DORSEY, FEDERICO G. HINOJOSA, Jr., and RODRIGUEZ, JJ.

## OPINION

RODRIGUEZ, Justice.

This is an appeal from an order granting a motion to suppress testimony of a state wit-

ness in a criminal trial where appellee, Daniel Mireles, stands accused of murder. The trial court found that the state's witness, Darlene Camacho, qualified as appellee's common law wife and that appellee could, therefore, invoke the husband-wife confidential communication privilege (TEX.R.CRIM.EVID. 504(1)) to prevent her from testifying against him as to certain oral statements made to Camacho by appellee. We affirm.

## BACKGROUND INFORMATION

Appellee stands accused of murdering Martin Hernandez in El Campo, Texas sometime between the evening of November 10, 1992 and the early morning of November 11, 1992. According to Camacho's statement to police, upon returning to his home at approximately 2:00 A.M. on the morning of the eleventh, appellee announced to Camacho that he had killed Martin Hernandez. Appellee showed Camacho that he had the victim's wallet. Appellee also allegedly told Camacho that he needed to contact Alex Quinones to inform him "that the job was done." According to Camacho, she and appellee then drove to Quinones' house where appellee entered alone. Upon returning to the car, appellee informed Camacho that he had told Quinones that "the job was done and everything was being taken care of."

After returning home, Camacho noticed that appellee was missing a ring. According to Camacho, appellee responded, "Oh, my God, I must have dropped it when I was covering up Martin with the weeds." The following morning appellee and Camacho drove to a site along a country road where she says appellee searched for his ring. Camacho claims that while she waited in the car for appellee, she could see, exposed in a ditch, the legs and feet of a dead body which she presumed to be that of the victim, Martin Hernandez. According to Camacho, appellee told her that he had to kill Hernandez because of "a debt that needed to be taken care of from the prison time."

At the pretrial hearing, appellee sought to suppress Camacho's testimony as to actions and utterances witnessed by Camacho. After a hearing, the trial court partially granted appellee's motion to suppress based on appellee's assertion of the husband-wife communication privilege. The trial court suppressed certain oral statements from appellee to Camacho, but denied appellee's request to suppress evidence of his nonverbal actions which Camacho witnessed.

## EXISTENCE OF COMMON LAW MARRIAGE

By its second point of error the State argues that the evidence is legally, or alternatively, factually insufficient to support a finding of a common law marriage between appellee and Camacho.

█ In a suppression hearing, the trial judge is the sole trier of fact, and he or she may choose to believe or disbelieve any or all of the witnesses' testimony. *Romero v. State*, 800 S.W.2d 539, 543 (Tex.Crim.App. 1990); *see Green v. State*, 615 S.W.2d 700, 707 (Tex.Crim.App. [Panel Op.] 1980), *cert. denied*, 454 U.S. 952, 102 S.Ct. 490, 70 L.Ed.2d 258, (1981); *Meek v. State*, 790 S.W.2d 618, 620 (Tex.Crim.App.1990). TEX. R.CRIM.EVID. 104(a) provides that the court shall determine preliminary questions regarding, inter alia, the existence of a privilege. *See Casillas v. State*, 733 S.W.2d 158, 168 (Tex.Crim.App.1986), *appeal dismissed*, 484 U.S. 918, 108 S.Ct. 277, 98 L.Ed.2d 238 (1987). An appellate court, when reviewing a ruling on a motion to suppress evidence, views the evidence in the light most favorable to the trial court's ruling and defers to the trial court's findings. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *Davis v. State*, 829 S.W.2d 218, 220 (Tex.Crim.App.1992); *see Vuong v. State*, 830 S.W.2d 929 (Tex.Crim. App.1992). Absent a clear abuse of discretion, the ruling on the admissibility of evidence will not be disturbed. *Rivera v. State*, 808 S.W.2d 80, 96 (Tex.Crim.App.1991); *see Smith v. State*, 683 S.W.2d 393, 405 (Tex. Crim.App.1984).

█ The elements of a common-law marriage in Texas are (1) an agreement to be

husband and wife; (2) living together as husband and wife; and (3) a holding out to the public that the couple are husband and wife. *Tompkins v. State,* 774 S.W.2d 195, 208 (Tex. Crim.App.1987); *Archie v. State,* 511 S.W.2d 942, 944–45 (Tex.Crim.App.1974). The existence of a common-law marriage is a fact question. *Hightower v. State,* 629 S.W.2d 920, 924 (Tex.Crim.App. [Panel Op.] 1981); *see Aguilar v. State,* 715 S.W.2d 645, 647 (Tex.Crim.App.1986). The burden of proof is on the one seeking to establish the existence of such a marriage. *Quinonez–Saa v. State,* 860 S.W.2d 704, 710 (Tex.App.—Houston [1st Dist.] 1993, pet. ref'd).

■ In the present case, the record reflects that the trial court heard the following evidence:

1. The couple began living together on January 29, 1992.

2. The couple never ceremonially married.

3. The confidential communications in question occurred on or about November 11, 1992.

4. The couple continued to live together until Camacho filed for divorce on January 5, 1993, wherein Camacho states in her petition for divorce that "the parties were common law married on January 29, 1992 in El Campo, Texas," and that "On or about January 1, 1993 they separated and ceased to live together as husband and wife."

5. The couple resumed living together approximately three weeks after the divorce petition was filed.

6. The couple continued living together up until the time that appellee was arrested.

7. The couple did not have any children together, did not file joint income taxes, and did not have any joint credit cards.

8. Camacho used the name "Mireles" as her own in letters written to appellee.

9. Camacho did not represent herself as "Mrs. Mireles" at any other time.

10. Camacho does not consider herself married to appellee. Appellee does consider himself married to Camacho.

The testimony of the appellee and Camacho was conflicting. We cannot say that the trial court either abused its discretion or drew a conclusion completely contrary to the facts in finding that a common law marriage existed. We therefore overrule the State's second point of error.

### STATUTE OF LIMITATIONS

In its third point of error, the State argues that appellee's claim of a common law marriage was barred as a matter of law by the statute of limitations. In particular, the State argues that TEX.FAM.CODE ANN § 1.91(b) (Vernon 1993) precludes appellee from trying to establish the existence of a common law marriage. Section 1.91(b) provides that, "A proceeding in which a marriage is to be proved under this section must be commenced not later than one year after the date on which the relationship ended or not later than one year after September 1, 1989, whichever is later." The State bases its statute of limitations claim on the fact that the parties separated, by virtue of the divorce petition, on January 1, 1993 and the suppression hearing took place on July 22, 1994, over six months after the expiration of the one year statute of limitations.

The State cites *Riley v. State,* 849 S.W.2d 901 (Tex.App.—Austin 1993, pet. ref'd), as authority for their position. In *Riley,* the State sought to prove the existence of a prior undissolved common law marriage to repudiate the accused murderer's assertion of the husband-wife privilege, arguing that the defendant's "informal marriage to Julie [Johnson] voids his subsequent ceremonial marriage to Lisa Riley, and therefore, the privilege does not apply." *Id.* at 902. The Austin Court of Appeals rejected that argument because, although the parties never formally dissolved the informal marriage, appellant ceased to live with Johnson in March 1987; therefore, the statute [§ 1.91(b)] precluded the State's attempt to prove his common law marriage in May 1992. *Id.*

While we agree with the interpretation of the law in *Riley*, we do not agree that the law cited in that case is dispositive of the present case. In *Riley*, the State sought to offensively establish the existence of a common law marriage. In the present case, appellee asserts the existence of a common law marriage from a purely defensive posture. We believe that this defensive posture enables appellee to seek to establish the existence of a common law marriage in this case.

In *Morris–Buick Co. v. Davis*, 127 Tex. 41, 91 S.W.2d 313 (1936) the Texas Supreme Court held:

The rule in this state is that where the subject matter of a defense interposed by the defendant constitutes an independent cause of action which does not go to the foundation of the plaintiff's demand, it cannot effect a reduction of the amount of the plaintiff's recovery except by way of setoff, and the statutes of limitation are available to the plaintiff in respect to such a defense. On the other hand, if the subject matter of the defense be of an intrinsically defensive nature, which, if given effect, will operate immediately as a negation of the plaintiff's asserted right to recover, or in abatement, either wholly or partially, of the amount claimed, the statute of limitation does not apply.

■ Appellee, as in *Morris*, has asserted the existence of a common law marriage from a purely defensive posture and likewise is not precluded from doing so by the statute of limitations.

Furthermore, during the suppression hearing, appellee referred to the holding in *Claveria's Estate v. Claveria*, 615 S.W.2d 164, 167 (Tex.1981), wherein the court stated that once a common law marital status exists, it, like any other marriage, may be terminated only by death or a court decree; once the marriage exists, the spouses' subsequent denials of the marriage do not undo the marriage. Appellee argued that the divorce petition in January 1993 acted as a temporary separation from the marriage and that, since the divorce never became final, their marriage still exists. Having heard argument by counsel and testimony by appellee, the court, in its discretion, determined that the common law marriage still existed. Accordingly, the State's third point of error is also overruled.

### HUSBAND–WIFE PRIVILEGE

Tex.R.Crim.Evid. 504(1) controls claims of the confidential communication privilege and provides, in relevant part, as follows:

(a) A communication is confidential if it is made privately by any person to his spouse and it is not intended for disclosure to any other person.

(b) A person, whether or not a party, or the guardian or representative of an incompetent or deceased person has a privilege during the marriage and afterwards to refuse to disclose and to prevent another from disclosing a confidential communication made to his spouse while they were married.

By its first and fourth points of error, the state contends that the trial court erred and abused its discretion in determining that appellee's oral admissions of murder were privileged because appellee did not intend for their communication to be confidential, and therefore no husband-wife privilege existed as to their communication. By its fifth point of error, the State argues in the alternative, that even if the privilege existed, appellee waived the privilege by revealing the privileged communication to Alex Quinones, a third party.

■ The State argues that appellee did not intend to keep his communication private because appellee said that he had to tell Quinones "that the job was done," and after exiting Quinones' home, appellee represented to Camacho that he had revealed the same to Quinones. The State cites *Zimmerman v. State*, 750 S.W.2d 194 (Tex.Crim.App.1981), as authority for their argument that appellee waived any privilege by discussing the same subject with Quinones, the effect of which was the same as if Quinones had heard the original statement from appellee to Camacho.

**890**

The holding in *Zimmerman,* however, only maintained that where a **written** confidential communication between husband and wife falls into the hands of a third party inadvertently and without the consent or connivance of the addressee-spouse, the third party should be permitted to testify as to the communication. *Id.* at 200 (emphasis added). The present case does not pertain to written confidential communication. All communications in question occurred during conversations between appellee and Camacho.

The State also cites *Bear v. State,* 612 S.W.2d 931, 932 (Tex.Crim.App.1981), which held that statements between husband and wife which are overheard by a third person do not come within the privilege of Art. 38.11 [now TEX.R.CRIM.EVID. 504]. Here too, the record does not show that the State produced any evidence that these communications occurred in the presence of a third party. Further, in the event the State had been able to produce such evidence, the State cites no authority and we find none which supports the proposition that confidential spousal communications allegedly revealed later to a third person are no longer privileged.

 Insofar as there is ample authority to support the State's argument that the confidential communication privilege applies to utterances and not acts, the trial court properly permitted the State to elicit Camacho's testimony as to the actions she observed. We also hold, however, that the trial court properly allowed appellee to invoke the husband-wife confidential communication privilege as to confidential oral communications between appellee and Camacho. Accordingly, we overrule the State's first, fourth, and fifth points of error.

The trial court's ruling is AFFIRMED.